Our final case for this morning is United States v. Richmond. Ms. Aleja. Thank you. Good morning. My name is Gabrielle Aleja. I represent the appellant here, Antoine Richmond. With few limited exceptions, a warrantless search of a home is unreasonable. In Jardines, the Supreme Court held that something as simple as a sniff on a person's porch was a search that required a warrant. In Kylo, the Supreme Court noted that detecting heat coming from a house also was a search that required a warrant. And just four months ago in Collins v. Virginia, the Supreme Court again visited law related to curtilage of a house when they ruled that a simple lifting of a tarp over a motorcycle sitting on a driveway under curtilage of a house was also a search that required a warrant. All of these cases show that under the Fourth Amendment, the protections of the home are heightened. It has always been viewed as the home has always been... Counsel, let me tell you what my difficulty is. Your whole brief seems to focus on opening the screen door rather than the entry onto the porch in the first instance. Did you object in the district court to the entry onto the porch? No, Your Honor. We agree that... That of course is the thing that's protected by Collins. Is there any marginal snooping involved in opening the screen door compared to entering the porch to begin with? Yes, Your Honor. Jardines actually instructed or answered... Forget about Jardines. I'm just asking whether there's any marginal snooping in opening the screen door. That's what every newspaper boy does to deliver the morning paper, and he doesn't get any information from the inside of the household. The other way of putting this is I have a great deal of difficulty seeing the difference between one side of the screen door and the other, even though I can certainly see the difference between the porch and the street. If, as this case comes to us, being on the porch was fine, what makes the screen door worse? The officer opened up that screen door to search. So can I ask, maybe to say being on the porch is fine is overbroad, because as I look at Collins, there is a boundary on the scope of the consent to go on that porch. It's okay if you're a Girl Scout selling cookies, as the court mentions, or possibly even a police officer doing a consensual knock and talk, but it does not extend to permission to search either the porch or the just inside the porch or the vestibule of the house or anything else. So I think the permission itself, if you look at the Supreme Court's decisions, is a confined permission. It's only for certain things. And perhaps I should be a little more clear in the argument that Mr. Richmond is making. Officer Boyack was the officer that spoke with Richmond, and when he went on that porch, he did so to talk to Mr. Richmond. Officer Malone, on the other hand, immediately went to that door. So his purpose on getting on that porch was to search. In fact, he testified that their chemistry was so great, that they had worked together for so long, that they knew the roles that they were going to take on without even speaking to each other. Mr. Boyack's, or Officer Boyack's role was to talk to Mr. Richmond, while Officer Malone's role was to determine what was put behind the door. Contact and cover is the way they determined, correct? Correct. Yes. So, the problem with what Officer Malone did is precisely that. He did go on that porch in order to search. And he did, in fact, search. And the Supreme Court has said that you cannot do that. So this is different, in other words, because it's the House, than the usual idea that if you are legitimately in a place, you can do anything you feel like in that place. Correct. But, if the officers here had a search warrant, or had a warrant for Mr. Richmond's arrest, or if they had exigent circumstances. Or if they had probable cause, perhaps. Or if they had probable cause. Think of the Santana case, where there was probable cause. Correct. But the officers didn't have any of those things in this case. All they had- What's your answer to the government's response on officer safety, and the extension of Terry to these circumstances? Yes. The officers testified that when Mr. Richmond approached them, he remained calm and cooperative. He did not- they testified that Mr. Richmond didn't give them any reason to be alarmed. And they also testified that although he sped up a bit, he was not running. Correct. And I know this, but Mr. Richmond had recently undergone knee surgery, so he couldn't go that fast. He also has a heart monitor, so there were all kinds of issues that were going to be slowing him down. It's also not accurate when the government said that he immediately turned when he saw the officers. When officers passed the intersection, and they spotted Mr. Richmond, Mr. Richmond was by a garbage can behind the house. And so he continued walking towards the front of his house. When he turned through the front lawn, that isn't so uncommon for it to be suspicious. Because if he had gone through the sidewalk, he would have had to go all the way to the corner, and then turn right, and then turn right again into his house. So he just cuts across his own front lawn. Correct. The officers admitted that when they first saw Mr. Richmond, as they passed that intersection, that they just got a feeling about this guy that was walking down the street with something in his pocket. A lot of the cases that the government relies upon to show that there was reasonable suspicion, such as Oglesby, are cases that were decided, and that case does talk about the concealment of a weapon, and that might give officers reasonable suspicion of a crime. But that case was decided before the Wisconsin legislature passed the CCW law, where people now are allowed to carry weapons both openly and concealed. And so the fact that officers saw someone who potentially had a weapon concealed doesn't say much about... Well, at that point, he hadn't done anything, either. He was just walking down the street. Now, the officers do say, eventually, when he sticks it behind the screen door, they think that's a move that somebody with a concealed weapon permit wouldn't make. But when he's walking down the street, he hasn't done anything yet. Correct. Yes. And when the officer... And the government and the officers both turned to that action of Mr. Richmond placing the dark object behind the door as reasonable suspicion that he was committing a crime. And that is certainly an interpretation that could be taken on. The other interpretation of that is that Mr. Richmond, who is an African-American man, may want to disarm himself before talking with police, given a lot of the things that are going on around our country. All right. Well, if you'd like to say some rebuttal, that's fine. I would. Thank you. Okay. Mr. Canning. Good morning. May it please the Court. My name is Jonathan Koenig. I appear on behalf of the United States this morning in Mr. Richmond's appeal. The hallmark of police conduct that comports with the Fourth Amendment is reasonableness. That's because the amendment itself confers a right to be secure in your persons, in your house, and your effects against unreasonable searches and seizures. But what would you say if instead of sticking the object between the screen door and the door, suppose their front door had a cat door that you could just... I'm sorry, a cat door, Your Honor? A cat door that your cat can go in and out. So he just shoved it through the cat door. So it's now, whatever the object is, it's now lying in the front hall. Would you say the officer could just go ahead and open the front door and check out the front hall? I'm honestly not sure, Your Honor. Cases like Payton v. New York draw a line at the threshold of the home. Well... More recent cases talk about... I would say that the screen door is that threshold myself. But I'm just trying to figure out how far you're going to go with this. You sounded to me like you were starting out on a very broad reasonableness theory that doesn't take into account the special status of the home. Well, where I was going was to try to articulate that we do regard this as an officer safety case that has to be viewed through the prism of Terry. I can't see any Terry case that has gone so far as to say you get to invade the home solely for officer safety when he is not posing a threat to anybody, according to the officer's own testimony. The alternative would be to say, let's get off the porch. Let's move farther away from the door. Exactly. That doesn't involve any intrusion of any kind. At which point they could have said, are you a felon? And he answered honestly. But every moment that you either engage in conversation or turn your back on the situation presents a risk. You can say the same thing about opening the screen door. That took some time and mental energy. But as I say, the alternative was to say, let's get off the porch. Well, I'm sure we could always think in retrospect of alternatives. That's not the kind of thing that's in retrospect. That's personal. You see somebody put a gun in a given place and make that place, say, the mailbox to take it a little farther from the house but still within the curtilage. You know, think of a house that has a mailbox on a post outside. Sure. The police, instead of searching the mailbox, might say, let's move away from the mailbox. They might. The situation unfolded. I'm sorry. My problem is looking at both Collins and Jardines, the court's most current wisdom on this ever kaleidoscopic subject of the Fourth Amendment, really has underscored that the rules for the home are strict. And we don't have probable cause. The first moment at which I would think even something approaching reasonable suspicion exists is when he puts something behind the door. Up until then, he's not doing anything that any citizen could do, as we have recently pointed out in the Watson decision. Well, there is the evasive behavior on her. I don't think it's evasive. I think if you look carefully at what the magistrate judge wrote and also what the officers testified to, he speeds up a little bit but not very much. He walks across the lawn. And he places the article between the two doors. That's what I'm saying. That's the first moment. When he opens the screen door, until that happens, this is not a situation of flight. This is not a situation of changing direction. The record just does not. This is not even a situation, frankly, of darting, which is the word that the government is using. He walks a little faster. That's what they say. And they themselves say he's not running. I'm not making that up. That's what the police officers said, not Mr. Richmond. I would just submit there's a spectrum of evasive behavior, Your Honor. This is how they perceived it. There's flat-out running, and there's picking up your pace, walking more briskly. But do you think evasive behavior, do you think they could go running into the house based on what Mr. Richmond had done? No. No. Because there was no cause to hold him. Your Honor, if I could just respond, though, to your comment about Jardines. There was no reasonable suspicion in that case. There wasn't even a suspect or a defendant physically present. I know. The dog is wandering around there, sniffing on the porch. And there was no concern for officer safety. Here we have a suspect who's coming back down the steps. And respectfully, I submit there was going to be a conversation with that person. But I can't think of a single case where the Supreme Court has extended Terry to the interior even of a curtilage, or certainly not something as close to the interior of a house as inside a screen door. And indeed, what I take from Collins, which I grant you was talking about the automobile exception, not various other exceptions. They even leave the door open for other exceptions. But what I take from that is the Court's very serious about confining these various exceptions to the Fourth Amendment carefully. I don't want to be cavalier about it, but there wasn't an automobile exception until Michigan v. Long came along. I'm telling you the way Collins treats that exception is to say don't take it and leverage it out into all sorts of directions that it was never made for. As I say cutely at one point, the automobile exception is well about automobiles. And many of the cases cited in your brief just sort of pick and choose from automobile cases, from probable cause cases. And I think we need to be more specific. But we do have a long line of cases under Terry where the Courts balance the extent of the Fourth Amendment invasion against the danger that's presented to the automobile. And I can't think of a single one where the Court has said that a concern for officer safety allows the officers to go into the house as opposed to doing something like what Judge Easterbrook is suggesting. But the principle, Your Honor, is what we're arguing for. But you know what, if you're right, we might not even have front doors anymore. The officers will just go into every house. No, that's Jardines. That's where the officers are curious and they go to snoop around. This is not that case, Your Honor. No, I mean with the guy on the porch, they'll go into every house. Somebody could be in the house, as you argue, about to jump out and help him. Well, we respectfully submit that you have a Fourth Amendment interest in your person that's very clear from the text of the amendment that's acknowledged in Terry. And yet we have this line of cases that balances the need for officer safety against that constitutionally protected zone. And the same analysis should apply here. What impact does the fact that Mr. Richmond is within the swing radius of the door have on the analysis? Well, the district court found as a factual matter that's not challenged that he could have armed himself quickly if he'd chosen to go back up the steps. I think maybe that would have made the situation a little more chaotic. I'm not sure exactly what the significance of that would be. But again, the officers here were doing two things on the Tuesday night of October 11, 2016 at quarter of midnight. They were investigating suspicious activity and they were taking measures to protect themselves and others, by the way. They had no idea who might be inside the home. They had no idea that it was his home. And we want police officers to do those things. Respectfully, I would submit that applying the exclusionary rule on these facts is not appropriate. If there's no further questions, I'll rest in our brief. But I'm happy to answer any further questions. I see none, so we thank you. Thank you. Ms. Leija. Just to quickly address the factual question about Mr. Richmond and where he was on the porch. The two officers testified inconsistently about where Mr. Richmond was when the actual search occurred. One officer, Officer Malone, who actually conducted the search, said that Mr. Richmond was right on top of the porch. Officer Malone, whose role was to talk to Mr. Richmond, whose role was to talk to Mr. Richmond, testified that when Officer Malone did the search, Mr. Richmond was already at the bottom step either on the cement or on the first step. I think that the significance of that is officers are investigating what they believe may be a crime happening. And what they do is they freeze the status quo. Officer Boyack is talking to Mr. Richmond, and he's watching him, whether he's nervous, whether he's fidgety, whether he's looking from side to side. None of those things are present. And Officer Malone is between Mr. Richmond and the door. To your Honor's comment about getting Mr. Richmond just off the porch, that actually did happen in this case. Mr. Richmond was off that top landing. Although he made the decision to walk down, correct? Correct. On his own. Thank you. That's all I have. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement, and the court will be in recess.